ANNIE C. WIMPFHEIMER et al., executors, &c., petitioners,

*v.*

J. H. THAYER MARTIN, State Tax Commissioner, respondent.

In the matter of the estate of CHARLES A. WIMPFHEIMER, deceased.

[Decided July 1st, 1940.]

588

*Messrs. McDermott, Enright & Carpenter* (*Mr. Joseph M. Proskauer* and *Mr. Charles Looker,* of the New York bar, also on the brief), for the appellants.

*Mr. David T. Wilentz,* attorney-general, and *Mr. William A. Moore,* assistant attorney-general, for the respondent.

BUCHANAN, VICE-ORDINARY.

The petitioners, as executors of the estate of Charles A. Wimpfheimer, appeal from the transfer inheritance tax levied in respect of the transfers comprised in several *inter vivos* gifts made by decedent and the transfers of his testamentary estate, under *P. L. 1909, c. 228,* as amended by *P. L. 1914, c. 151.* He died testate, resident of this state, November 26th, 1934, at the age of 77.

Decedent was the owner of all the outstanding stock, common and preferred, of the American Velvet Co. and of A. Wimpfheimer & Bro. He had a wife and three children. On January 2d, 1923, then aged 66, he made outright gifts of blocks of 4,999 shares of preferred in the former, and of 3,750 shares of preferred in the latter company, to his wife and each of his two sons; and on December 31st, 1923, he transferred additional blocks of 2,500 preferred shares in the latter company to each of the aforesaid donees. On the same dates, for the benefit of his daughter, he placed equal blocks of stock in trust, designated himself as trustee, and provided that the fund be held until his daughter reach the age of 26 years, or until her decease prior to that age, or until termination of the trust by act of the trustee; that in the meantime such portion of the income as the trustee might deem proper should be applied to the education, maintenance and support of said daughter; that upon the termination of said trust the *corpus* and the accumulated income should be transferred to the daughter, if living, and if not, to her issue in equal shares, or in default of such issue, to the next of kin of the grantor. The trustee was given discretionary power to terminate the trust at any time after said daughter attained the age of 21 years. He did, in fact, so terminate it, on November 22d, 1927, and the fund was then turned over to the daughter.

On April 4th, 1933, the decedent executed his last will and testament whereby he provided that the residuary estate be held in trust for the following purposes; to pay over to his wife an annual income of $75,000 for life; to divide equally among the children any income in excess of the $75,000 annuity; to divide the fund upon the wife's death into three equal portions; to pay over to each of the sons 50% of his portion in cash, and to hold the balance in trust for each during his life and upon death for his respective descendants during their lives, to the extent permitted by law, subject to a power of advancement in the trustees; to hold the daughter's portion in trust for her until she should become 40 years of age, at which time one-fourth of the principal should be paid over to her; to hold the balance thereof for her bene-

fit for her whole life; subject to a power of advancement in the trustees, and upon her death for the benefit of her descendants to the extent permitted by law, subject to a power of advancement in the trustees. The levy of transfer inheritance tax with respect to this testamentary estate is not in dispute except as to the tax appraisal, at face value, of a $20,000 note of the United States Finishing Company.

The commissioner determined that the several *inter vivos* transfers were made in contemplation of death. He thereupon not only assessed tax in respect of the outright gifts to the wife and sons, upon appraisals made as of the dates of the transfers and applied the tax rates in effect on the date of decedent's death, but he also made an assessment in respect of the gifts in trust for the daughter, upon appraisals made as of November 22d, 1927,—the date when the decedent, as trustee, terminated the trust instruments and turned over the trust assets to the daughter,—and applied thereto date-of-death tax rates.

Of the claimed deductions of $75,000 for counsel fees and $100,000 for executors' commissions, the commissioner in his computation of the tax, allowed only $50,000 and $35,109 respectively.

Appellants contend that the tax levies are erroneous because (they claim) (1) none of these transfers were made in contemplation of death; (2) if the transfers are taxable, the tax appraisals of the outright gifts to the wife and sons should have been made as of the date of death, November 26th, 1934, instead of as of the dates of the transfers, January 2d and December 31st, 1923; (3) if the transfers are taxable and if the tax appraisals as of the dates of transfer are proper, the stock transferred under the trust instruments should be valued as of the respective dates of the execution of those instruments; and (4) the tax rates in effect on those dates of transfer should be applied instead of those in effect at the date of death; and (5) the note of the United States Finishing Co. is valueless. Appellants also contend (6) that the right to further deductions for counsel fees and executors' commissions should be reserved to the estate.

1. *Taxability as in contemplation of death.*

That the *inter vivos* gifts made to decedent's wife and children were made in contemplation of death is clear under the circumstances of those transfers and the law as presently established in this state. This is so, even though at the dates thereof decedent was in excellent health, was at the zenith of his business career, and lived 11 years thereafter. The gifts, made when the decedent was 66 years of age, effected, and were made with the intent and purpose to effectuate, a final disposition and distribution of over a quarter of his estate (consisting of preferred stock of his own companies), equally among the members of his family and the natural objects of his bounty. The disposition of the equal number of shares transferred under the trust instrument was substantially similar to the testamentary disposition of the three equal portions of the remainder interest of the residuary estate provided for by the terms of his will which he executed ten years thereafter. It was also provided therein that the income derived from the residuary estate in excess of the life annuity bequeathed to the wife was to be paid outright in equal shares to the sons and the daughter, just as the shares of stock were distributed to the sons and the wife. The value of the property transferred, at the time of the transfers, was approximately $3,000,000 and constituted about 26% of his assets. The stock transferred comprised about one-fourth of all the preferred stock issued; and the decedent retained the remainder of the preferred as well as all of the common stock in which the power to vote dividends rested. Thereafter, until the date of his death, all the stock in the two corporations was held by the decedent and the members of his family, and he expressed the wish in his will that the executors, to whom he gave the exclusive power to sell all of the common stock, give his sons an opportunity to purchase such stock in equal proportions and at the same prices.

Obviously the transfers were made in lieu of a testamentary disposition, and are taxable as transfers made in contemplation of death, under the meaning and intent of the statute. *In re Schweinler, 117 N. J. Eq. 67, 175 Atl. Rep. 71, affirmed, 13 N. J. Mis. R. 722, 180 Atl. Rep. 774; In re Hartford,*

*122 N. J. Eq. 489, 194 Atl. Rep. 806; affirmed, sub nom. Hartford v. Marlin, 120 N. J. Law 564, 1 Atl. Rep. (2d) 13; affirmed, \*122 N. J. Law 283, 4 Atl. Rep. (2d) 31.* Certainly there was ample evidence before the commissioner to justify his finding in this behalf; and appellants have therefore failed to establish error on this point.

Appellants argue that it appears by the evidence that the impelling motives for these transfers were the decedent's desires to effect a reduction of surtaxes under the federal income tax laws and to provide the donees with independent incomes. While it does appear that decedent discussed the desires aforesaid with his attorneys, it is clear that they were not impelling causes in the making of these stock transfers. Prior thereto, the decedent, despite the fact that the earnings of the American Velvet Co. were large and that he had the power to vote dividends by virtue of his common stock holdings, "had not drawn a cent of money out of that business for years;" nor did he declare dividends thereon in any subsequent year. Furthermore, it appears that decedent did not vote dividends on the A. Wimpfheimer & Bro. preferred stock, from the date of the first transfers to November, 1927, and there is no showing as to the extent of dividend payments thereon, if any, prior or subsequent to that period. Indeed, although the American Velvet Co. made a profit in excess of $400,000 in 1923 and of $280,000 in 1924, thereafter its margin of profit and that of A. Wimpfheimer & Bro. unexpectedly fell off until, at the date of decedent's death, both companies suffered losses. However, it is clear that these transfers effected neither a reduction of decedent's income tax payments nor an increase of the donees' incomes during the four years subsequent thereto,—a period in which the financial status of each company warranted the payment of dividends had the decedent been desirous of accomplishing either or both of the desires aforesaid. Finally, the facts that the older son had received a $100,000 wedding present in 1917 and that contemporaneously with these transfers the younger son's annual salary was increased from $5,000 to $12,500 further negative the contention that the impelling cause

thereof was the decedent's desire to provide his sons with independent incomes.

Appellants also contend (and there is testimony in support thereof) that other impelling motives for these transfers were the decedent's desires to reward his sons for their services to the companies and to encourage them to continue in the business. Taking this to be true, it is nevertheless equally true that it was not requisite for decedent to make this "testamentary disposition" in order to accomplish the consummation of his desires aforesaid. Furthermore, as stated in *In re Hartford, supra,* at page *491:*

"Even if the desire aforesaid was *an* impelling motive for the transfer, and one without which the transfer would not have been made, it is nevertheless clear that it was not the only impelling motive for so much of the transfer as constitutes the 'testamentary disposition;' and that, for that part of the transfer, the desire and intent to accomplish an ultimate disposition and distribution of his estate in lieu of a testamentary disposition in that behalf, was an impelling motive without which such ultimate disposition would not have been thereby effected. It is not a requisite of taxability that the contemplation of death shall have been the sole motive for the transfer. *In re Schweinler, supra; In re Grabfelder, \*107 N. J. Law 520, 153 Atl. Rep. 532.*"

Appellants lay stress on the recent determination in *Colorado National Bank, &c.,* v. *Commissioner, 305 U. S. 23.* That determination however is simply that the question of whether or not a gift was made in contemplation of death is a question of fact and that where a fact finding tribunal has made a finding of fact that a gift was not made in contemplation of death, the reviewing court will not disturb that finding if there was substantial evidence to support it. The instant case presents the converse situation. The commissioner has found as a fact that the gifts *were* made in contemplation of death, and this court believes there was ample and substantial evidence to support that finding, and therefore adjudges that that finding is not to be disturbed. The cited case is obviously authority *for,* and not *against,* the affirmance of the commissioner's finding.

2. *Date of appraisal of the outright gifts.*

As has heretofore been adjudicated in *Renwick* v. *Martin, 126 N. J. Eq. 564, 10 Atl. Rep. (2d) 293,* transfers *inter vivos* which are taxable as having been made in contemplation of death, and which are not intended to take effect at or after the death of the transferor, are to be assessed upon appraisals made as of the date of the transfers. On this point, also, there is therefore no error by the commissioner.

3. *Date of appraisal of the gifts in trust.*

The trust instruments were irrevocable and gave the daughter the income (or so much thereof as the trustee (donor) should deem proper), until she attained age 26; or until her death, if she died before attaining that age; or until such time as the trustee at his discretion, might earlier accelerate the termination of the trust. The *corpus* or remainder was to go to the daughter absolutely, on her attaining age 26, or in the event of an earlier accelerated termination of the trust by the trustee during her life; but in the event of her death before either of those events, it was to go to other designated beneficiaries.

Appellants call the interests thus created, a vested life estate followed by a vested but contingently defeasible remainder. Strictly it would seem rather to be vested but contingently defeasible (equitable) estate for a term of years,—*i. e.,* the (approximately) eight years which would elapse between the date of the commencement of the trust and the date when she would become 26 years of age; this estate for years being subject to termination on either of two contingencies, to wit, her death, or the accelerated termination by the trustee, prior to her attaining age 26. The remainder following after this defeasible estate for term of years was also vested but likewise contingently defeasible.

These transfers were therefore immediate and complete in the aggregate,—leaving no interest remaining in the testator, and the daughter's interests were vested as soon as the instruments were executed, even though they were subject to divestment. *Cf. Reinecke* v. *Trust Co., 278 U. S. 339.* None of these interests so transferred were in any wise made dependent upon the death of the transferor. They were not transfers intended to take effect at or after the transferor's death.

On the other hand these trust deeds did not constitute a single, indefeasible transfer at one time of the complete interests in the property to a single person, as did the transfers to the wife and sons, and as did the transfers to the wife and daughters in the *Renwick* case, *supra;* hence the determination in the *Renwick* case as to date of valuation would not necessarily be applicable and controlling as to the transfers under the trust deeds here *sub judice.*

Under the specific provisions of the statute, both as it existed in 1923 and as it existed at decedent's death in 1934,—(see section 2 thereof),—on a (taxable) transfer (whether testamentary or *inter vivos*) of an estate for life or for a term of years, and a vested remainder, the *whole* property transferred is to be appraised *immediately* (*i. e.,* immediately upon the transfer) at its clear market value. The value of the estate for life or for years is then to be ascertained, and the value of the remainder is to be ascertained by deducting the value of the estate for life or years from the appraised value of the whole property aforesaid. The tax on the prior estate, and also the tax on the remainder, are made "immediately" due and payable,—*i. e.,* immediately on the making of the transfer.

It seems clear that these provisions of section 2 do not apply to the instant case,—that they are intended to apply only to those cases where the estates (subsequent to the prior estate) transferred are not only vested but indefeasible; because the statute proceeds, in section 3, to deal with those cases where a contingent or defeasible estate is transferred. In such case, (says the statute, expressly), the whole property is to be appraised *immediately,* (*i. e.,* immediately on the transfer) and the value of the prior estate for life or years is to be ascertained and deducted from that appraised value of the whole property. The tax on the transfer (if taxable) of such prior estate is to be immediately levied and assessed. The tax on the balance of the appraised value of the whole property (left after deducting the value of the prior estate) is not to be levied or assessed until the transferee comes into the beneficial enjoyment, seisin or possession thereof, and if taxable shall *then* be taxed.

596

These provisions of section 3 do not apply to cases where the contingency of the estate in remainder depends on the exercise of a power of appointment,—because the section proceeds expressly to provide somewhat differently for such cases; but the instant case does not involve the exercise of any power of appointment. The transfers presently *sub judice* assuredly comprise a prior estate for years, (defeasible on certain contingencies), followed by a remainder which though vested is contingently defeasible, (the contingency not being the exercise of a power of appointment) and therefore come under the first sentence of section 3.

Under the provisions of this first part of section 3, the duty of the commissioner was to appraise the whole property immediately,—*i. e.,* immediately upon the execution and delivery of the trust instrument and trust property; hence, to take the valuation of that whole property as of the date of that execution and delivery,—the date of transfer. See the *Renwick* case, *supra.* He should then have appraised and ascertained the value of the (defeasible) estate for years (in that whole property valued as of the date of transfer), deducted it from the value of the whole property, and immediately assessed and levied tax on that (defeasible) estate for years; but should have deferred assessing and levying tax "on the balance of said appraised value of such estate" until the actual vesting of the remainder interests in enjoyment and possession, and at *that* time should assess and levy the tax on the transfer of those contingent or defeasible remainder interests. All this is expressly stated in the statute.

The trustee in fact did terminate the trust on November 22d, 1927, and at that time the contingently defeasible remainder interest completely and indefeasibly vested in possession, enjoyment and title, in the daughter. At that time therefore it was the commissioner's duty under the statute to assess and levy the tax on the transfer of that remainder. Clearly under the statute it was not his duty to make a new appraisal or valuation of the whole property—but only to assess and levy the tax on the transfer of that remainder interest,—on "the balance of said appraised value of such

estate" left remaining after deducting from the value of the whole property, (appraised as of the date of the transfer), the value at which the preceding estate for years had been appraised.

The reason,—and the only reason,—why the tax on the transfer of the remainder could not feasibly be assessed (calculated) and levied at the same time as the tax on the transfer of the prior estate for years,—and the only reason why the statute did not so provide (as it does in section 2), was because under the scheme of taxation in the statute the rates of tax vary with the identity of the transferee, and the identity of the transferee of the contingent remainder could not be known until the happening of the contingency.

That which the commissioner should have done in the assessment and levy of tax on the transfers by these trust deeds is quite different from that which he actually did. He valued the trust assets not as of the date of transfer, but as of November 22d, 1927, and assessed and levied a tax in respect thereof as though there had been no transfer prior to that date but a single, outright transfer of the whole to the daughter on that date.

This was error. There were transfers of interests in these trust assets in 1923,—partly vested and partly contingent, but in the aggregate comprising the whole interest in the property (trust assets). Upon those transfers, (being made in contemplation of death) the statute imposed taxes, and provided that such taxes should be computed (at certain rates) upon the value of the interests so transferred, and that such value of such interests should be based on the value of the whole property as of the dates of the transfers. True it is that such of those transfers as were of contingent or defeasible interests were not complete until the happening of the contingency, but they were complete and irrevocable so far as any act or control by the grantor was concerned; and under the statutory provisions no tax is imposed on that completion of transfers. The only materiality of the happening of the contingency, under the statutory provisions, is that it identified the transferee and thus enables the commissioner

to apply the proper rate of tax under the statutory scale to the value (as of the date of the original transfer) of the interests transferred, and to. levy the tax accordingly.

The appellants contend that the value of the remainder interest should be made upon the basis of the value of the whole property as of the date of the transferor's death; but this is incorrect, as heretofore pointed out.

4. *Rates to be applied to the inter vivos gifts.*

a. *What statute applies?*

At the dates of the *inter vivos* transfer to the wife, the sons, and the trustee for the daughter (January and December, 1923), the statutory rates of taxation, on transfers to persons bearing these relationships to the transferor, ran from one to three per cent.,—varying according to the value of the property transferred. See *P. L. 1922, c. 174,* last paragraph of section 1. On July 1st, 1927,—prior to the termination of the trust by the trustee and the turning over of the trust estate to the daughter,—an amendment took effect, under which the rate scale ran from one to sixteen per cent. See *P. L. 1927, c. 228, p. 428.* This continued to be in force at the date of the death of the transferor, November 26th, 1934.

The commissioner, in assessing and levying the taxes in the estate here *sub judice,* added together the values of the testamentary transfers and the *inter vivos* transfers to each beneficiary, and applied the tax rates provided in the act of 1927. Appellants concede that the 1927 rates should be applied to the testamentary transfers, but contend that such applications should be made as if there had been no *inter vivos* transfers, and further contend that the *inter vivos* transfers,—if taxable on the basis of the values as of 1923,—should be taxed at the rates in effect in 1923 (1922 statute) and not at the rates in effect in 1934 (1927 statute).

The question as to what rates of tax are applicable to *inter vivos* transfers, seems never to have been determined in this state. Its determination of course depends primarily upon the statutory provisions and the true interpretation thereof.

By the statute of 1922, in effect at the time of the *inter vivos* transfers, a tax "is hereby imposed upon the transfer of

any property * * * when the transfer * * * is * * * made in contemplation of the death of the grantor," &c. Under the natural meaning of this language, the tax attaches or arises at the time of the transfer. A tax "hereby imposed upon the transfer" is imposed upon a transfer at the time of the occurrence of the transfer,—unless there be other language in the statute indicating a different intent, and none such is found in this statute.

On the contrary other provisions in the statute further substantiate the conclusion that the tax attaches at the instant of transfer. By section 2 of the statute it is provided that when any *inter vivos* gift is made, contemporaneously, of an estate for life or for years to one person and of the remainder to another, the whole of the property shall be appraised *immediately*,—(*i. e.*, immediately upon the transfer) ; that the values of the estate for life or years and of the remainder be ascertained and determined; and that the taxes on the transfers of the estates for life or years and the remainder shall be *immediately* due and payable. Also under section 3, in the case of a transfer *inter vivos* of an estate for life or years with a contingent or defeasible remainder, the whole property is to be appraised *immediately,* and the tax on the estate for life or years is to be *immediately* assessed and levied. By implication the same is true as to complete transfers *inter vivos* of the whole interests in property, (instead of a transfer of separate successive interests in the property). See *Renwick* v. *Martin, supra.*

It seems perfectly certain that a tax imposed on a transfer, which tax is to be levied and assessed, or become due and payable, immediately upon the occurrence of the transfer, must needs be deemed to be imposed upon and attach to the transfer at the moment of the occurrence of the transfer; and that it must needs have been the meaning and intent of the statute that it should be calculated and computed on the rates prevailing at that moment of transfer. It could not be computed on any other rates, if computed immediately on the transfer. Section 5 of the statute provides that "all taxes imposed by this act shall be due and payable at the death of

the * * * grantor * * * unless in this act otherwise provided." From a reading of the entire act it would seem that the only taxes as to which the time of becoming due and payable is "otherwise provided," are the taxes under section 2, and the taxes on the contingent future interests under section 3; all other taxes are due and payable only at the death of the transferor. This however does not militate against what has been said in the preceding paragraphs herein. There is of course a very clear distinction between the time of the imposition or attaching of a tax and the time when it becomes due and payable; they may be, but need not be, identical.

The rates existing at the time of the *inter vivos* transfers in 1923 were those provided in the last two paragraphs of section 1 of the statute of 1922. "All taxes imposed by this act shall be at the rate," &c. That statute of 1922 imposed the taxes on the transfers of 1923; and imposed those taxes at the rates specified in that statute. Those taxes, having been already imposed and attached,—at those rates,—prior to the amendment of 1927, would not be affected by that amendment; at any rate unless there were some clear indication of such an intent in that amendment,—and there is no such indication.

Counsel for the state relies on *Milliken* v. *U. S., 283 U. S. 15*, but the statutory provisions involved in that case were quite different from those in the case at bar. In the *Milliken* case the decedent made gifts in contemplation of death, after the enactment of the federal taxing statute of 1916, and died after the enactment of the statute of 1918, which imposed higher rates than the 1916 act. Taxation at the 1918 rates was upheld because (*inter alia*) the 1918 act expressly provided that such rates should be applied in the case of gifts in contemplation of death made prior to the passage of the act by a donor who died subsequent to the passage of the act. In the instant case, as has been said, there is no such provision, express or implied, in our statute of 1927. On the contrary, the provisions of the statute of 1922, both as originally enacted and as amended in 1927, impose the tax on transfers in contemplation of death at the moment of transfer and at the statutory rates then existing.

It is concluded therefore that the commissioner erred in applying the 1927 rates to the *inter vivos* transfers. The 1927 rates *are* applicable to the subsequent testamentary transfers, and this is not disputed.

b. *In what manner are the 1922 and 1927 rates to be applied?*

Counsel for the state contends that the gifts *inter vivos* and the testamentary gifts, to one and the same beneficiary, should be added together for the purpose of computing and determining the amount of tax to be assessed and levied, relying on the opinion of the Supreme Court in *Kunhardt* v. *Bugbee, 3 N. J. Mis. R. 1107, 130 Atl. Rep. 660;* (affirmed on reargument, *4 N. J. Mis. R. 692, 134 Atl. Rep. 118*). This is what was done by the commissioner (albeit on the basis of the 1927 rates as applicable to the total aggregate of the respective gifts). The appellants, by the ninth specification in their petition of appeal, assigned as error that the commissioner did cumulate the gifts·in assessing and computing the tax; but their briefs are silent on this point and, under the well established rule, it is therefore deemed abandoned. The only mention in appellants' briefs as to cumulation of gifts in computing the tax, is the admission,—indeed, contention,—that computation of the tax, on the basis of such cumulation, is entirely practical and feasible,—(this in the course of their argument that the 1927 rates should not be applied to the *inter vivos* gifts). This is of course true. In re-assessing the taxes the commissioner can, and should, apply the 1922 rates to the values of the *inter vivos* gifts and apply the 1927 rates to the testamentary gifts to the same persons, and take into consideration the amounts of the prior *inter vivos* gifts in applying the 1927 rates to the testamentary gifts.

5. *Appraisal of the note of U. S. Finishing Co.*

This note, (part of the assets passing by will), was for $20,000,—part of a series of $88,500 outstanding, made February 10th, 1932, due February 1st, 1935. It was appraised by the commissioner, as of November 26th, 1934 (the date of decedent's death), at face value. Appellants contend it had no value whatever.

It was impossible to ascertain actual "market value;" there

was no market for these notes and there had been no sales. In order to determine values of shares of stock, under similar circumstances, "book value" may properly be taken as the basis. *In re Moore, 104 N. J. Eq. 400, 145 Atl. Rep. 544.* So also, to determine the value of these notes, under the circumstances, the "book value" method of determination may properly be used as a basis. Appellants, indeed, do not contend otherwise. The "book value" however is not necessarily to be taken as the actual market value,—the "clear market value" or "fair market value" prescribed by the statute. It is to be taken as the *basis,* and is to be modified according to such other circumstances as appear (if any) which might affect the valuation. *In re Moore, supra.* In the instant case there are such other circumstances.

The commissioner drew his conclusion that the notes were worth face value, from the facts that the auditor's statement of the company's books showed a net surplus of assets over liabilities sufficient almost to equal the entire face value of capital stock, preferred and common; also that both the common and preferred stock had an actual market value (roughly 1% and 3% respectively). It is contended therefore on behalf of the commissioner, that since the company's stock had value, the company's obligations to creditors must necessarily have been worth face value.

On the other hand, however, the company (with net assets at book value of roughly $9,000,000) had been operating at a loss running from $275,000 to $550,000 every year for several years past; had been operating for six months past under an order of the federal court under section 77-B of the Bankruptcy act; the auditor's statement above mentioned expressly gave no effect to the change in the company's status resulting from the aforesaid court order, and even aside from that, the values ascribed to the company's assets in that statement, were necessarily (except for the $220,000 cash item) *estimated* values. Most important of all, the company's *secured* obligations,—its first mortgage bonds which were secured by a first lien on the greater part of the company's assets, were in default as to interest for almost two years, and they had an actual market value of 35% at which they

were currently bought and sold. Obviously this seems conclusive and incontrovertible proof that to the company's *unsecured* notes there could not be ascribed a fair "market value" in excess of 35% of face value. This is true, notwithstanding the fact that the stock of the company had an actual market value of the trifling amounts mentioned. It is common knowledge,—and there was testimony before the commissioner,—that it frequently happens that the stock of insolvent corporations in receivership is dealt in speculatively, and thus has actual, but nominal, market value.

There was therefore no substantial evidence before the commissioner sufficient to support a finding of value in excess of $7,000 for the note here in question; and he was in error in so doing. *Spalding* v. *Thayer Martin, 119 N. J. Eq. 603,* at *606, 183 Atl. Rep. 281.* On the other hand it is equally clear that there was evidence before him sufficient to support a finding of some value; appellants fail to establish their claim that he was in error in failing to find that the note had no value. *In re Gould, 105 N. J. Eq. 598,* at *603, 148 Atl. Rep. 731.*

6. *Amount of deduction allowed for commissions and counsel fees.*

Appellants contend that the commissioner erred in failing to allow deduction of the full amounts claimed by appellants before the commissioner for commissions and counsel fees.

The record however discloses no specification of error in this regard, in the petition of appeal; the issue is therefore not presently before this court. Moreover, even if it were, the record is barren of any evidence to establish error as contended. The amounts allowed were estimated sums; and the commissioner is willing to make proper adjustment and return, (if such *should* be made), if and when the amounts are definitely established by action of the Monmouth Orphans Court.

The record will be remitted to the commissioner for re-appraisal and re-assessment in accordance with the determinations herein expressed.